Joseph HARDY, Plaintiff,

v.

Leon L. PORTER et al., Defendants.

No. DC 74–103–K.

United States District Court,
N. D. Mississippi,
Delta Division.

Dec. 16, 1977.

Melvyn Leventhal, New York City, Fred L. Banks, Jr., Jackson, Miss., for plaintiff.

Semmes Luckett, Clarksdale, Miss., for defendants.

MEMORANDUM OF DECISION

KEADY, Chief Judge.

This suit was begun August 26, 1974, by Joseph Hardy, plaintiff, formerly employed

as assistant principal of the Clarksdale High School, against the superintendent and members of the school board of the Clarksdale Municipal School District (Board), for an order directing that defendants employ him as high school principal for the school year 1974–75, and also for back pay for the two prior school years because of the Board's constitutionally impermissible failure to appoint him to that position. Plaintiff brought his case on alternative grounds. First, he asserted that as a *Singleton*-protected teacher, he was unlawfully demoted when the court ordered a consolidation of the Clarksdale public schools in January 1970, and he was transferred from the position of principal of the formerly black, or predominately black, Higgins Junior-Senior High School to the assistant principalship of the integrated, but formerly predominately white, Clarksdale High School, thus claiming a cause of action based upon special rights created by the Fifth Circuit in *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211, 1218 (1970). Second, he asserts that his constitutional rights protected by the Equal Protection Clause were violated because of his demotion and two subsequent refusals of the Board to offer him the principalship of Clarksdale High School.

On December 11, 1975, this court conducted an evidentiary hearing, at the conclusion of which, in a bench ruling, it was held that the evidence showed that the plaintiff, by voluntarily resigning from the school system on June 4, 1971, to engage in postgraduate studies at Auburn University—a reason wholly unrelated to the desegregation process—Hardy forfeited the special protection afforded by *Singleton*. On appeal, *Hardy v. Porter*, 546 F.2d 1165 (5 Cir. 1977), the district court was affirmed on this issue, but was reversed on equal protection claims for our failure to make a dispositive ruling thereon, with due consideration accorded to the principle that the burden of proof in the case rested upon the Board to show that its employment decisions respecting the plaintiff were not racially motivated. Upon the remand, the court allowed the parties to offer additional evidence on the constitutional issue in an evidentiary hearing conducted August 19, 1977. Legal memoranda having been filed, the case is now ripe for disposition, and in accordance with Rule 52, F.R.Civ.P., we incorporate herein findings of fact and conclusions of law as follows:

## I.  FINDINGS OF FACT [1]

1.  Hardy holds a bachelor of science degree from Alcorn State University (1949), a master's degree in education from Tuskeegee University (1961), a specialist degree from Auburn University (1972), and an additional year (1974–75) on his doctorate degree at Auburn University, completing all course work except the writing of a dissertation. Plaintiff served briefly as registrar at Coahoma Junior College from July 1, 1972, until September 1974; he is now employed as Dean of Student Affairs at that institution.

2.  In January 1970, this court ordered immediate desegregation in the Clarksdale public schools applicable to the students and faculty of all schools, effective not later than February 1, 1970, in conformity with *Alexander v. Holmes County Board of Education*, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). Thus, under the court's direct command, the entire school organization was radically changed; Higgins Junior-Senior High School, of which Hardy had been principal since 1963, attended largely by black students and staffed by a predominately black faculty, was converted into a two-grade (8 and 9) city-wide junior high school; the three upper grades for students of both races were assigned to the Clarksdale High School; and all 7th grade students of both races were assigned to the Riverton Intermediate School.[2]  As a conse-

1.  Because the present and former findings of this court are to some degree interrelated, restatement of certain facts previously found will be necessary for an understanding of the legal issue; other facts were developed at the second hearing.

2.  The organization of the seven elementary schools is not material to this case.

quence of court-ordered consolidation, it became necessary for Superintendent Tynes and Assistant Superintendent Stampley to make extensive transfers of both administrators and faculty. While these administrators did not adopt written criteria of an objective or nondiscriminatory nature by which to govern their decisions, neither did they contemplate that the administrator of any school would be dismissed. For the second school semester, in 1970, it was anticipated that, though organized differently, the public schools would have the same number of students and teachers.

3. The question arose immediately as to who would become principal of the Clarksdale High School. The two persons considered for that post were Robert Ellard, the white principal who had previously served in the predominately white Clarksdale High School, and the plaintiff. Both held AA Certificates and were qualified in secondary school administration. Though Ellard had more total teaching experience than Hardy, he had less seniority at Clarksdale where Ellard had served as an administrator for 5 years and Hardy 8 years. The decision made by the superintendent, concurred in by the assistant superintendent, a black, and approved by the Board, was that Ellard continue as principal of the reorganized desegregated high school and Hardy become assistant principal. At the same time, the officials decided that with respect to the two-grade Higgins Junior High School, Mrs. Ollie Melchor, a black, should become principal, with a white assistant principal. During the short interval between school semesters, 23 white teachers and 2 black teachers resigned, and 3 additional white teachers were asked to resign when they refused to accept new assignments (Dft. Ex. 1, 2nd hearing). As a result of the three grade high school consolidation, the student enrollment increased to 865. Of this number, 480 were white students previously attending Clarksdale High School, while 385 were blacks who were transferred from Higgins.

4. Ellard and plaintiff, who had not previously worked together, had several conferences to discuss their respective duties, and plaintiff expressed no dissatisfaction to the superintendent or assistant superintendent with his new assignment. Hardy later testified, "I didn't disagree on the transferring. I did though prefer becoming principal rather than assistant principal, but under the conditions, I felt the transfer as assistant principal might have had some merits." (R. 199, 2nd hearing). From the beginning in his new post, plaintiff expressed no dissatisfaction whatever regarding his reassignment, and he was given a contract for another year, 1970–71, for the same position. He and Ellard worked together harmoniously and, though traumatic conditions prevailed at the high school on occasions requiring the presence of police officers, there was no rupture or strain between Ellard and Hardy as school administrators.

5. During March 1971, plaintiff became interested in pursuing post-graduate work and applied for a grant. In early June 1971, the plaintiff was advised that a grant of $7,500 was available and he decided to accept it. When plaintiff gave notice on June 4, 1971, of his decision to resign as assistant principal, he realized he was under contract until the end of June, and he asked to be released from his contract at that time. It was easily ascertainable to plaintiff, or anyone else interested, that the same administrative staff would be hired for the forthcoming school year, 1971–72. This, of course, meant plaintiff would have had continued employment as assistant high school principal under Ellard. In submitting his letter of resignation, plaintiff sought no leave of absence, but pointed out that his wife, Mrs. Herticine Hardy, a classroom teacher, would continue in the school system since she did not plan to join him while he was doing post-graduate work at Auburn. The salaries contracted to be paid Hardy ($10,920) and Ellard ($10,400) were not reduced in any respect for the 1969–70 school year. The compensation paid to the

two administrators were based upon uniform factors, except that Ellard received $800 more for performing bus coordination responsibilities. For the ensuing year 1970–71, both administrators were paid greater compensation. That year Ellard, as principal, received total compensation of $12,300, including service for bus coordination, while plaintiff, as assistant principal, received $11,220.

6. In his post as assistant principal, Hardy was not simply transferred to a strange building, he encountered unique and unprecedented problems to be reasonably expected in any sudden school reorganization of a biracial character. The clear weight of the evidence is, and the court finds the fact to be, that the duties which Hardy performed at Clarksdale High School as assistant principal were no less responsible or important than those which he performed as Higgins' principal. Indeed, greater skill in human relations, to achieve cooperation with students and faculty of both races, was called for in the new administrative position. We find as a fact that the assistant principalship of a large integrated high school, attended by older students of both races in their last years of public education and taught by a diversified biracial faculty, quite different from the traditional high school setting, may not be fairly regarded as a demotion. The label that an administrator may be given is certainly not conclusive, or even persuasive, on the question of whether Hardy experienced a demotion in the responsible aspects of his work as an educator. Plaintiff's subjective feelings that in 1970 Ellard, and not he, was made high school principal because of race finds no support from the evidence in the case. Indeed, Hardy's experience in the Clarksdale system, according to his own statement, was one of great satisfaction. As we have previously found, when the plaintiff resigned, it was not because he regarded himself as a victim of discrimination or that he felt he had been relegated to a subordinate or inferior position but solely because he wanted to take advantage of the opportunity to do post-graduate work. His expression of thanks to the Board for the

opportunity during the time he had worked for the school system as set forth in his resignation letter cannot be ignored; the sentiments he then expressed are wholly inconsistent with the notion that he had, prior to that date, been discriminated against. We reaffirm our prior finding that plaintiff voluntarily terminated his employment relation with the school board without pressure, at a time when he had reasonable expectation that he would be rehired in the same position for the ensuing school year. Instead, he chose to further his educational attainments.

7. In September 1971, Superintendent Tynes advised the Board of his intention to retire in June 1972. Therefore, the Board engaged Dr. John E. Fay, a professor of the University of Mississippi School of Education, to objectively screen applicants for the position of superintendent and make recommendations to the Board for a successor to Tynes. Ellard was among those applying. No black educators submitted applications. Dr. Fay, in due course, recommended Ellard for the position, and the Board, in March 1972, acted upon his recommendation and appointed Ellard superintendent. The public announcement of this appointment was delayed for several days, or until March 20, 1972. At or about this time, plaintiff, still enrolled as a graduate student at Auburn, manifested an interest in the vacancy of the high school principalship occasioned by Ellard's elevation to superintendent. Hardy first inquired of retiring Superintendent Tynes, who referred him to his successor. In early March 1972, plaintiff contacted Ellard by phone regarding the principalship vacancy. During his testimony at the December 1975 hearing, Hardy stated that Ellard advised him that the high school principalship had not been filled, but would soon be; that he, Hardy, would be considered, that as for submitting a formal application, plaintiff was told by Ellard, "I need not reapply since my credentials were with the superintendent, and it was suggested that at the end of the year I was attending school that I could update my application." Two weeks later, Hardy contacted Ellard

who invited him to come to his office for a conference, at which time he indicated that the position had not been filled but that he had no further contact with Ellard (R. 16–17, 1st hearing). Hardy stated it was not until the next month he learned that Sam Kendricks, who had previously been both a teacher and assistant high school principal, had been selected as high school principal. Hardy gave a somewhat different version at the second trial, stating: "I called Dr. Ellard . . . At that time I was at Auburn but at home on a visit. I told Dr. Ellard that I had talked to Mr. Tynes and that I was interested in applying, for the principalship. . . . He [Mr. Ellard] told me they were considering Mr. Kendricks. They were considering recommending Mr. Kendricks, and that he would talk with me later. . . . I asked Dr. Ellard if it was necessary for me to submit my credentials. My credentials were already with the system. He felt it was not necessary. Later I could submit my work that I was engaged in at that time, but later in April the announcement came that Mr. Kendricks had been appointed. During the March to April date, I had not talked to Dr. Ellard anymore about the position." (R. 200–201, 2nd hearing). Ellard conceded that Hardy called him, did not deny Hardy's statement that he need not file a written application, but maintained that he told Hardy that Kendricks was his choice.

8. At its April 13, 1972 meeting, the Board, upon Ellard's recommendation, employed Sam Kendricks, a white, the holder of a AA Certificate in secondary administration, and who had served as assistant principal for two years under Ellard. It does not appear that Ellard gave any consideration to Hardy's informal, oral application. Nor was the Board advised of the interest of Hardy, who would have been entitled to AAA certification as of May 1972. Kendricks continued to serve as the high school principal until the close of the school year 1974–75. Some months earlier, Kendricks advised Ellard that he would be leaving the school system to enter other work, and from this time forward, Ellard began to consider a successor for the upcoming vacancy.

9. Terry Mood, a white, who had served as assistant principal under Kendricks for one year, held a AA Certificate in secondary education. It appears that Ellard almost at once regarded him as the likely successor to Kendricks. Learning that Kendricks would be vacating the high school principalship, Hardy again contacted Ellard, who told him that he was recommending Mood to succeed Kendricks. At the time of this particular inquiry, Hardy was, or had previously been, serving as registrar at the Coahoma County Junior College. Ellard apparently gave no serious consideration to Hardy's desire to succeed Kendricks as high school principal, nor does it appear that Hardy's request was ever brought to the Board's attention. Ellard testified that he regarded Mood, like Kendricks, better qualified and more suited than Hardy for the job of high school principal.

10. In May 1975 Assistant Superintendent Stampley died, and Hardy promptly submitted a formal application for that position. At the time of the initial hearing in December 1975, the position of assistant superintendent had not been filled because of strained financial conditions, but Dr. Fay had been contacted by the Board to screen applicants for the post, as he had in the case of the superintendent. There were a number of applicants, both black and white, who sought the post of assistant superintendent. The school officials, while not advertising for a black person, were in fact looking for a black administrator to become assistant superintendent because of the Board's commitment previously made to the Clarksdale black community to replace Stampley with a black. After publicly advertising the vacant position state-wide, the Board selected Jessie Buie, a black, who held a AAA Certificate, with 27 years total educational experience as a classroom teacher, athletic coach, and administrator as elementary principal, junior high and senior high principal. Dr. Fay, however, screened only those applicants coming from outside the Clarksdale school system. He did not interview

Hardy or three other applicants who had been employed in the Clarksdale school system. Thus, these four, including Hardy, were directly interviewed by the Board and not subjected to Dr. Fay's screening. On August 1, 1977, Buie entered upon his duties as assistant superintendent.

11. Since Hardy departed the school system in June 1971, the Board has consistently followed a policy of employing, at the senior high school level, whites either as principals or assistant principals until the present, although the Clarksdale High School, with a current enrollment of about 750 students, is 60% black (Plt. Exh. 1, 1st hearing). A black principal, usually with a white assistant principal, has been employed at the Clarksdale Junior High School.[3]

12. The evidence shows without dispute that since March 1970, all principals of the Riverton or 7th grade school have been of the white race. Of Clarksdale's 7 elementary schools, all principals of the predominately black or formerly black schools, are or have been blacks (Myrtle Hall, Oliver, Riverton and Booker T. Washington), and all principals of the formerly all-white, or predominately white, elementary schools (Heidelberg, Kirkpatrick, Oakhurst) have been of the white race. Subject to two exceptions,[4] no white administrator has been hired by the Board to serve as principal of a previously all-black school, and no black has been hired, either as principal or assistant principal at Clarksdale High School or any elementary school which was formerly predominately attended by white students and administered by white personnel. Of the 15 new principals and assistant principals hired

since the date of the integration order, only three have been black, all of whom have replaced former black administrators.

13. Superintendent Ellard testified that he preferred to promote administrators from within the school system, rather than going outside, whenever it was possible to fill the vacancy with a qualified person. He stated that it was primarily for that reason he recommended both Kendricks and Mood, and not Hardy, for the high school principalship. Ellard denied that his decision on either occasion not to recommend Hardy was because of his race. Leon Porter, Board president, stated that the Board was never aware of Hardy's interest in filling the vacancy in the Clarksdale High School principalship, twice occurring since Hardy submitted his resignation in June 1971. Porter, too, denied that the Board's decisions in employing school administrators at the various schools were racially motivated, affirming that the Board looked to Superintendent Ellard to recommend qualified personnel. As regards the selection of a successor to Stampley's position as assistant superintendent, Porter expressed his belief that, objectively and subjectively, Buie was better qualified than Hardy to fill that post, and the Board's choosing of Buie was not dictated by animosity toward Hardy. Plaintiff, however, felt that his filing of the present suit influenced the Board against considering him for the assistant superintendent's position.

## II. CONCLUSIONS OF LAW

1. This court has unquestioned jurisdiction to entertain and decide this controver-

---

**3.** Louis Jackson, first employed as principal of Clarksdale Junior High School in 1972, was given no opportunity to apply for any vacancies occurring in the high school administrative staff. In August 1973, at a time when Terry Mood was principal of Riverton Intermediate School, the Board minutes reveal that Superintendent Ellard stated that "Louis Jackson, principal of junior high, was qualified [to become a senior high school administrator] but that he would not recommend that we make this move because Mr. Jackson was too valuable at the Clarksdale Junior High School." (Plt. Exh. 5, 2nd hearing). In his testimony, Ellard conced-

ed that at no time did he consult with Jackson regarding his desire to become a high school administrator. To this date, Jackson remains as principal of the Clarksdale Junior High School. (R. 141, 2nd hearing).

**4.** Since March 1970, white principals only have been assigned to Riverton 7th Grade Intermediate School (formerly predominately black); and for one school year, 1971–72, a white principal was assigned to Clarksdale Junior High School (formerly black, or predominately black Higgins Junior-Senior High School).

sy arising under 42 U.S.C. §§ 1981, 1983 and under the Equal Protection Clause of the Fourteenth Amendment under grant of jurisdiction conferred by 28 U.S.C. § 1343(3) and (4).

█ 2. We begin our analysis by acknowledging that the Board, under the Fifth Circuit's mandate, must assume the burden of showing that its employment decisions affecting plaintiff were not racially motivated. This allocation of the burden of proof, a doctrine first enunciated by the Supreme Court in *Keyes v. School District No. 1,* 413 U.S. 189, 208–209, 93 S.Ct. 2686, 2697–2698, 37 L.Ed.2d 548, 563–64 (1973), has been followed consistently by the Fifth Circuit in cases of nonrehired teachers asserting racial discrimination against school boards in their employment practices. *Roper v. Effingham County Board of Education,* 528 F.2d 1024 (5 Cir. 1976), ("the school board has the burden of proving that its personnel decisions were free from racial considerations"); *Barnes v. Jones County School District,* 544 F.2d 804 (5 Cir. 1977). *Barnes* articulated the burden of proof principle more precisely than did Circuit Judge Godbold, writing for the majority, in reversing us in the instant case, for in the *Barnes* case, in an opinion also authored by Judge Godbold, the district court, although affirmed on the *Singleton* issue present in that case, was nonetheless reversed for not reaching the equal protection claim asserted by the plaintiff, a black teacher, who was not rehired by the Jones County School Board. In remanding the case for a determination "of the undecided claim that equal protection was violated by racially-based discrimination," the Court held:

"The immediately past history of racial discrimination in this system established a prima facie case of violation of equal protection in plaintiff's alleged demotion and discharge, so that on remand the burden will be upon the school district to justify its actions, . . . by 'clear and convincing evidence,' *Baker v. Columbus Municipal Separate School District,* 329 F.Supp. 706 (N.D.Miss.1971), aff'd, 462 F.2d 1112 (CA5, 1972); *Wil-*

*liams v. Kimbrough,* 295 F.Supp. 578, 585 (W.D.La., 1969); . . ." *Barnes,* at p. 807.

Because of controlling authority, we find unacceptable the Board's contention that the Fifth Circuit erred in applying the burden of proof rule to this case, and the *Keyes* doctrine should not apply here. We must, therefore, hold inapposite the line of cases relied upon by defendants, i. e., *Fluker v. Alabama State Board of Education,* 441 F.2d 201, 205–06 (5 Cir. 1971), and *Callahan v. Price,* 505 F.2d 83, 87 (5 Cir. 1974), which involved asserted violation of First Amendment rights (and not claims of racial discrimination based on the Equal Protection Clause), and which do cast upon a teacher-plaintiff the burden of proving that he was not continued in employment for the constitutionally impermissible reason of exercising free speech rights protected by the First Amendment. We are constrained to observe that the Fifth Circuit has evolved a distinction with respect to the burden of proof in claims against a school board based upon racially motivated employment decisions and claims of alleged impingement of First Amendment rights. While we agree that, factually, the case sub judice bears slight, if any, resemblance to the evidential circumstances present in the *Keyes* case, nevertheless the burden of proof principle therein enunciated has been consistently followed by the Fifth Circuit, and in fact forms the legal basis for the reversal of our first holding, concerning which the Fifth Circuit said it was "unable to say that consideration was given to the [requisite] burden of proof." 546 F.2d at 1168. Thus, it is incumbent upon the Board to justify by clear and convincing evidence its actions regarding employment decisions relating to the plaintiff.

3. Because of Circuit Judge Coleman's dissent, we have carefully analyzed *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and *Arlington Heights v. Metro. Housing Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), to ascertain if *Keyes'* articulation of the burden of proof has been modified by the Supreme Court in the two supervening cases

so as to compel an approach different from that which we have taken herein. Our conclusion is to the contrary, for we hold that the *Keyes* doctrine relative to allocation of the burden of proof in public education claims of racial discrimination remains fully viable. That doctrine is

> that a finding of intentionally segregative school board actions in a meaningful portion of a school system . . . establishes . . . a prima facie case of unlawful segregative design on the part of school authorities, and shifts to those authorities the burden of proving that other [discriminatory actions] within the system are not also the result of intentionally segregative actions. 413 U.S. at 208, 93 S.Ct. at 2697.

In *Washington v. Davis,* supra, a Fifth Amendment case, the Supreme Court expressly stated the *Keyes* doctrine to be prevailing in litigation—"whether and to what extent there [has] been purposeful discrimination resulting in a particular or wholly segregated school system." 426 U.S. at 244, 96 S.Ct. at 2049. Similarly, *Arlington Heights,* although a Fourteenth Amendment case, reaffirmed that Davis did not disturb or alter the "principle [of disproportionate racial impact giving rise to a prima facie case of segregative intent] well established in a variety of contexts. E. g., *Keyes v. School District No. 1,* 413 U.S. 189, 208, 93 S.Ct. 2686, 2697, 37 L.Ed.2d 548 (1973) (*schools*) . . . ." (Emphasis added).

■ 4. The Board, in our opinion, has affirmatively and satisfactorily shown that Hardy was not demoted when he was transferred from Higgins to be assistant principal of the Clarksdale High School, upon entry of the January 1970 desegregation order, or that his responsibilities or duties were in any substantive way diminished as a result of the original reassignment. The evidence amply supports our finding of fact that, neither in the *Singleton* sense nor from a constitutional standpoint, was Hardy discriminated against in the reassignment process necessitated by the desegregation order, nor was he thereafter discriminated against while serving as assistant principal of the Clarksdale High School un-

til his June 1971 resignation. Not only do Hardy's actions and statements during this period of his employment as assistant principal flatly contradict his testimony that he "felt" he was being discriminated against, the overwhelming evidence also presented by the Board plainly shows that he was not demoted or otherwise diminished as an educator in the Clarksdale school system. The undeniable fact is that plaintiff voluntarily resigned, separating himself from the school system, to pursue post-graduate training to improve himself in his chosen field. We have no difficulty, therefore, in finding that the Board has met the requisite burden of proof with respect to the first aspect of the charge relating to impermissible demotion.

■ 5. The difficult question arises in ascertaining whether the Board discharged its burden of showing, by the clear and convincing evidence standard, that Hardy was not considered, because of race, for reemployment when vacancies occurred in the high school principalship, first in 1972 and again in 1974. Since Hardy was without *Singleton* protection, the Board was certainly under no obligation to seek him out and offer him the principalship. The Board, however, was chargeable with the acts of its superintendent, and, through him, was required to consider Hardy, as well as all other applicants, for employment on the basis of objective, merit qualifications, irrespective of race. The critical portion of this case is to correctly evaluate the actions of Ellard, as the Board's representative, in dealing with Hardy's known interest in twice applying for the principal's vacancy. It is not enough for Ellard or the Board to offer generalized and conclusory statements that Hardy was not hired because of racial considerations. Instead, the school officials must be able to ground their actions on convincing evidence that Hardy was not employed as high school principal for reasons wholly unrelated to race. Several considerations strongly militate against the sufficiency of the Board's defense. First, it cannot be gainsaid that Hardy timely applied for the principal's position

each time it became vacant, and that he was told by Ellard that he need not submit a formal application in writing because of his past connection with the school system. Thus, Hardy may not be regarded as a nonapplicant, or one who had no known desire to fill specific vacancies occurring in the Clarksdale High School administration. He followed the course suggested by Ellard as superintendent, yet he failed to receive favorable recommendation at any time. No evidence was proffered by the defendants that Hardy lacked the qualifications for the job. Ellard's explanation for preferring Kendricks, and later Mood, over Hardy as high school principal was that they were already in the school system and qualified for promotion. No claim may be made that either Kendricks or Mood had objective, educational credentials, or certification and experience that equalled Hardy's. Conceding that a policy of promoting qualified personnel from within a school system, instead of going outside, certainly passes constitutional muster as an objective and permissible method for filling vacancies, the Board's record of employing administrators contradicts Ellard's stated goals. It seems apparent that promoting qualified personnel from within appears to have been effective only in favor of white, and not black, administrators. For example, Lewis Jackson, black principal of the Clarksdale Junion High School, was given no opportunity to apply for vacancies occurring in the high school administrative staff even though he had the same certification in secondary education and greater seniority in the system than both Kendricks and Mood. The reason assigned for not promoting Jackson is remarkably inconsistent with Superintendent Ellard's testimony, for he advised the Board, according to the official minutes, that Jackson "was qualified . . . but . . . was too valuable at the Clarksdale Junior High School." This explanation, if found credible, would effectively preclude Jackson from sharing in Superintendent Ellard's established policy of recommending high school administrators, whether assistant principals or principals, for higher positions as vacancies occurred.

6. The treatment accorded to Lewis Jackson is relevant to Hardy's case because it sheds light upon the Board's consistent employment practice, since the advent of desegregation, of staffing the formerly white, or predominately white, Clarksdale schools with white administrators. The statistical evidence proffered by plaintiff contradicts the Board's assertion that its employment decisions regarding Hardy, as well as other black administrators, were not motivated by racial considerations. The inescapable inference is that the Board continues to perpetuate in the Clarksdale public schools a remnant, at least, of a dual school system by employing white administrators for the formerly "white" schools and black administrators for the formerly "black" schools. This practice offends the Constitution and settled case law announced by the Fifth Circuit and this court. See e. g., *Lee v. Macon County Bd. of Ed.,* 482 F.2d 1253 (5 Cir. 1973); *McCormick v. Attala County Bd. of Ed.,* 407 F.Supp. 586 (N.D.Miss.1976), vacated and remanded on other grounds, 541 F.2d 1094 (5 Cir. 1976). Moreover, since the consistent pattern of hiring blacks as administrators for formerly black schools and white administrators for the so-called "white" schools emerges so clearly from actions taken by Clarksdale's school officials, we conclude that the Board and its superintendent should have reasonably known that their employment decisions were violative of both recent case law dealing with racially motivated hiring, see *Lee,* supra, and their clear affirmative duty to eliminate every vestige ("root and branch") of a constitutionally impermissible dual school system. *Alexander v. Holmes County Bd. of Ed.,* 396 U.S. 1218, 90 S.Ct. 14, 24 L.Ed.2d 41 (1969); *Green v. County School Bd. of New Kent County,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

7. Viewed in the context of *Keyes'* mandate concerning the burden of proof, defendants' past hiring practices lead to the inexorable conclusion that they have failed to rebut the prima facie case of racial discrimination by showing that their "ac-

tions . . . [were not in] any degree motivated by segregative intent." *Keyes, supra,* 413 U.S. at 210, 93 S.Ct. at 2698. The employment of a black as assistant superintendent to succeed a black man, the deceased Stampley, provides small comfort to the Board's claim that it is pursuing a racially nondiscriminatory policy in hiring administrators by filling the position of assistant superintendent with a black administrator of acknowledged qualifications. In so doing, the Board, we think, was acting consistently with its overall policy of staffing administrators in "black" and "white" positions. The Board's president asserted that a black assistant superintendent was selected to carry out a specific commitment made with the Clarksdale black community to appoint a black assistant superintendent. The school officials' commitment to the local black community, however, cannot be used to justify abridgement of their affirmative constitutional duty to refrain from perpetuating any remnant of a dual school system. We observe that, as interpreted by settled case law of federal courts at all levels, the Constitution provides the only permissible standard against which the practices of the defendant school board must be measured and judged. Moreover, in applying that standard in a closely analogous context, the Court of Appeals for the Fifth Circuit recently stated that

> When the official actions challenged as discriminatory include acts and decisions that do not have a firm basis in well accepted and historically sound non-discriminatory social policy, discriminatory intent may be inferred from the fact that those acts had foreseeable discriminatory consequences.

*United States v. Texas Ed. Agcy.,* 564 F.2d 162 at 168 (1977). Applying this standard to the facts of the present case, we are bound to conclude that the defendants failed to meet the burden under *Keyes* to rebut, by clear and convincing evidence, the prima facie case of racial discrimination made out by plaintiff under claims asserted under the Equal Protection Clause. Our reluctance and hesitancy in substituting our judgment for the Board's prerogative to choose the administrators and staff to man its public schools does not allow us to abdicate our responsibility for vindicating plaintiff's established claim of impermissible, unconstitutional conduct. Liability is therefore found against the defendant school officials.

8. We next address the relief available to plaintiff. The record shows that from 1972 to the present, Hardy's earnings, excluding the two years he was pursuing post-graduate work (1971–72 and 1974–75), aggregated $71,420 while employed at Coahoma Junior College; that if he had been principal of Clarksdale High School during the same period, apart from the two sabbatical years, he would have earned, in the aggregate, $78,640, leaving a difference of $7,220,[5] which sum he is entitled to recover as back pay. The plaintiff's chief goal is employment as the high school principal, a post presently filled by Mood. Indeed, plaintiff, in his counsel's brief, does not seek to have the position vacated and filled by his appointment at this time. Of course, relief of that nature, if demanded, would not be consonant with equity. Nevertheless, because of the constitutional violation, equity does require that we command the superintendent and Board, upon the next vacancy occurring in the high school principalship, to offer the position to Hardy, and allow him 30 days within which to accept or reject the offer. More specific details shall be spelled out in our Judgment. Plaintiff's counsel are entitled to recover a reasonable attorney fee, under the Educational Amendment Act of 1972, 20 U.S.C. § 1617, as well as under the Civil Rights

5.

| | Hardy's Earnings | Principalship Salary |
|---|---|---|
| 1977–78 | $18,460 | $19,000 |
| 1976–77 | 17,508 | 18,000 |
| 1975–76 | 15,200 | 17,000 |
| 1974–75 | Post-graduate work | Not applicable |
| 1973–74 | 11,052 | 12,320 |

| | Hardy's Earnings | Principalship Salary |
|---|---|---|
| 1972–73 | 9,200 | 12,320 |
| 1971–72 | Post-graduate work | Not applicable |
| | $71,420 | $78,640 |
| | | 71,420 |
| | | $ 7,220 |

Attorneys Fee Award Act of 1976, 42 U.S.C. § 1988.

Let Judgment in conformity with the foregoing issue forthwith.